IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANGELA N. HUNTER,

        Plaintiff,

    v.                            Case No. 13-2232-SAC

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

MEMORANDUM AND ORDER

This is an action reviewing the final decision of the Commissioner of

Social Security which denied plaintiff disability insurance benefits and

supplemental security income payments. The matter has been fully briefed

by the parties.

## I. General legal standards

The court's standard of review is set forth in 42 U.S.C. § 405(g), which

provides that "the findings of the Commissioner as to any fact, if supported

by substantial evidence, shall be conclusive." The court should review the

Commissioner's decision to determine only whether the decision was

supported by substantial evidence in the record as a whole, and whether the

Commissioner applied the correct legal standards. *Glenn v. Shalala*, 21 F.3d

983, 984 (10th Cir. 1994). When supported by substantial evidence, the

Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the conclusion. *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). The determination of whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it really constitutes mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). But the standard "does not allow a court to displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Trimmer v. Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999).

The Social Security Act provides that an individual shall be determined to be under a disability only if the claimant can establish that he has a physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity (SGA). The claimant's physical or mental impairment or impairments must be of such severity that they are not only unable to perform their previous work but cannot, considering their age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy. 42 U .S.C. § 423(d).

The Commissioner has established a five-step sequential evaluation process to determine disability. If at any step a finding of disability or non-disability can be made, the Commissioner will not review the claim further. At step one, the agency will find non-disability unless the claimant can show that she is not working at a "substantial gainful activity." At step two, the agency will find non-disability unless the claimant shows that she has a "severe impairment," which is defined as any "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled. If the claimant's impairment does not meet or equal a listed impairment, the inquiry proceeds to step four, at which the agency assesses whether the claimant can do her previous work. The claimant is determined not to be disabled unless she shows she cannot perform her previous work. The fifth step requires the agency to consider vocational factors (the claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 540 U.S. 20 (2003).

The claimant bears the burden of proof through step four of the analysis. *Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir. 1993). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy. *Nielson,* 992 F.2d at 1120; *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993). The Commissioner meets this burden if the decision is supported by substantial evidence. *Thompson,* 987 F.2d at 1487.

## II. Procedural History

Plaintiff, at age thirty-two, filed applications for disability insurance benefits and SSI alleging bipolar disorder and depression but not mental retardation. At step one, the administrative law judge (ALJ) found that plaintiff had not engaged in substantial gainful activity since January 1, 2010, her amended alleged onset date. The ALJ found at step two that the plaintiff has severe impairments of affective disorder/anxiety disorder, but found at step three that those impairments did not meet or equal the severity of a listed impairment presumed severe enough to render one disabled.

Accordingly, the ALJ determined plaintiff's residual functional capacity (RFC) and found she is able to perform a full range of work at all exertional levels, with the following nonexertional limitations: superficial interaction with co-workers and supervisors, and infrequent interaction with the general public on the job. Tr. 18. The ALJ found the plaintiff could perform her past

relevant work as a cleaner, and alternatively found that plaintiff could perform other jobs that exist in significant numbers in the national economy, including industrial cleaner, order filler, electronics subassembler, and small-parts assembly. Tr. 21-22. The ALJ thus determined Plaintiff is not disabled.

## III. Listed Impairment of Mental Retardation

Plaintiff's primary argument is that the ALJ erred in not finding her disabled at step three under the listing for "mental retardation," found at 20 C.F.R pt. 404, subpt. P, app. 1, § 12.05.[1] Plaintiff relies on an IQ test conducted by John Bopp, Ph.D. on February 18, 2011, at the behest of her attorney. (Tr. 310-12). Dr. Bopp administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) and the Wide Range Achievement Test (WRAT) (Tr. 310-11). Dr. Bopp found valid IQ scores of 66 on the verbal portion, 79 on the performance IQ portion, and 70 in full scale IQ.

The ALJ's decision addresses the IQ scores and rejects them as inconsistent with the remainder of the record. She notes that the only evidence of mild mental retardation is from Dr. Bopp's single IQ test, and that no other evidence of record, including Plaintiff's school history and other medical reports, supports that finding.  (Tr. 310-11).

---

[1] In August of 2013, the term "mental retardation" was changed to "intellectual disability" in Listing 12.05, *see* 78 Fed.Reg. 46,499, but the Court uses the term used by the parties.

Plaintiff has the burden of demonstrating that her impairments meet all of the specified medical criteria contained in a particular listing. *See Candelario v. Barnhart*, 166 Fed.Appx. 379, 382-83 (10th Cir. 2006). The standards for listed impairments were intentionally set high because they operate to cut off further inquiry relatively early in the sequential evaluation process. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

To meet Listing 12.05, titled Mental Retardation, a claimant must meet the "capsule definition" and one of the four severity prongs for mental retardation. *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007). The capsule definition states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1. The relevant severity prong, 12.05(C), requires the Plaintiff to show a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Lax,* 489 F.3d at 1085. Thus Plaintiff must meet three criteria:  (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Lax*, 489 F.3d at 1085.

6

### A. Onset Before Age 22

As to the first criteria, Plaintiff contends that mild mental retardation is a lifelong condition, so the court should presume from her IQ score at or around age 32 that she was mildly mentally retarded before age 22. *See* 20 C.F.R., pt. 404 subpt P, app.1 Sections(s) 12.00(B) (4).

But the Tenth Circuit has not decided, as some courts have, that one's IQ score after age 22 creates a rebuttable presumption of the same IQ score before age 22. *See Bland v. Astrue*, 432 Fed.Appx. 719, 723, 2011 WL 1571463, 4 (10th Cir. 2011) (declining to presume from an IQ score of 67 that the claimant must have been retarded before age 22; finding that an isolated score of 67 would not support a presumption, and that school and work history would overcome a presumption in any event). Plaintiff cites cases from other circuits and an unpublished Kansas district court decision to support her position, but this court is not bound by those decisions. *See Camreta v. Greene*, ___ U.S. ___, 131 S.Ct. 2020, 2033 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case. 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed.2011)."). Nor does Plaintiff point to sufficient evidence other than her IQ scores to show that she had significantly subaverage general intellectual functioning with deficits in adaptive functioning before she was 22. Nonetheless, the Court will assume, arguendo, for purposes of

analysis that the rebuttable presumption exists in this jurisdiction and has not been rebutted in this case.

## B. Valid IQ in Stated Range

The parties' primary dispute is whether the Plaintiff had a valid verbal, performance, or full scale IQ of 60 through 70, as necessary to meet the second criteria. Plaintiff's verbal and full scale IQs fall within that range, but the parties disagree whether those scores were "valid," as is required. *See Wall v. Astrue,* 561 F.3d 1048 (10th Cir. 2009).

The ALJ is not required to accept an IQ score which is inconsistent with the record. *Lax*, 489 F.3d at 1087.

> ... we emphasize that the ALJ need not simply accept IQ results reported by an expert. By its own terms, 12.05C requires a *valid* IQ score, and "[t]he regulations do not limit the question of validity to test results alone in isolation from other factors." *Brown,* 948 F.2d at 269. Accordingly, the ALJ may discount an IQ score as invalid for a variety of reasons, so long as there is substantial evidence in the record to support his conclusion.

*McKown v. Shalala*, 5 F.3d 546 (Table), 1993 WL 335788, 3 (10th Cir. 1993). Thus an ALJ may consider other evidence in the record to determine whether the IQ scores are valid. Standardized intelligence test results are only part of the overall assessment. See *Flores v. Asture,* 285 Fed. Appx. 566, 568–569 (10th Cir. July 30, 2008).

Despite Plaintiff's stated IQ, the ALJ found that Plaintiff did not meet or equal listing 12.05. The ALJ stated her reasons for giving the IQ test results no weight:

Mild mental retardation is not medically determinable in this case. In so finding, the undersigned has given no weight to the conclusions in the psychological report at Exhibit 6F. The claimant underwent the examination that formed the basis of this report, not in an attempt to seek treatment for problems, but rather through her attorney in anticipation of her disability hearing -– that is, in an effort to generate evidence for this appeal. Presumably, the doctor was paid for the report. The test results were provided without the raw responses. The conclusions in this report are inconsistent with the fact that the claimant has been living independently and raising her children. They are also inconsistent with the claimant's reports and testimony that she was never in special education classes in school, except possiblyin the 1st or 2nd grade (She is not certain of the details.) (Ex.2F/4). Her educational history is not consistent with this diagnosis, either. According to school records and the claimant's report, she dropped out of the 11th grade because she was pregnant (Ex's16E/4 and 2F/4). No other medical source has reported that she has mild mental retardation. At the hearing, the undersigned observed that the claimant was articulate. She read and wrote responses to disaiblity forms in her own handwriting without assistance. (See, e.g., Ex. 7E).

Tr. 15. Accordingly, the Court examines the reasons given by the ALJ, each of which is challenged by the Plaintiff, and the evidence of record.

## 1. IQ Test for Sole Purpose of Disability Claim

Plaintiff concedes that her IQ report was prepared in anticipation of her disability application and is not from a treating physician. Nonetheless, Plaintiff contends reports from acceptable medical nontreating sources are generally entitled to significant weight. 20 C.F.R. § § 404.1502, 416.902.

The law does not require an ALJ to give significant weight to all nontreating sources. See *Doyal v. Barnhart,* 331 F.3d 758, 763 (10th Cir. 2003) (finding the opinion of an examining physician/nontreating source who only saw the claimant once is not entitled to the sort of deferential treatment

accorded to a treating physician's opinion.). Instead, that determination is fact-specific. The ALJ may give whatever weight to Dr. Bopp's IQ report it merits, as long as she weighs it in accordance with the regulatory factors, 20 C.F.R. §§ 404.1527(d), 416.927(d), and explains her rationale for the weight given. *See Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007), quoting *Watkins v. Barnhart,* 350 F.3d 1297,1300 (10th Cir. 2003) (It is the ALJ's responsibility to ensure that her "decision [is] 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.') Here, the ALJ specified the weight she gave to the nontreating source report, and clearly stated her rationale.

## 2. Lack of Raw Data

The ALJ discounted the IQ test results, in part, because those results were unaccompanied by any raw responses. To this, the Plaintiff contends that "the regulations prohibit the ALJ from interpreting raw test data from psychological testing" and require the ALJ to obtain a medical expert's opinion to evaluate and interpret "background medical test data." *See* HALLEX I–2–5–34(b), 1994 WL 637370 (requiring the ALJ to obtain the testimony of a medical expert "[t]o evaluate and interpret background medical test data."); HALLEX I–2–5–14.D, 1992 WL 601806 (defining "background medical test data" pertaining to psychological issues to include "raw test data such as answer sheets or drawings.").

Plaintiff's argument relies solely on the HALLEX manual. Hallex is "a set of internal guidelines for processing and adjudicating claims under the Social Security Act." *Social Sec. Law Center, LLC v. Colvin*, 542 Fed.Appx. 720 (10th Cir. 2013). That manual does not contain regulations and Plaintiff fails to show it has the force and effect of law. The Tenth Circuit has not decided that issue. *See Butterick v. Astrue*, 430 Fed.Appx. 665, 668 n. 3 (10th Cir. 2011) (declining to resolve the issue).

Further, the absence of raw data precluded the ALJ from deciding whether to obtain a medical expert to evaluate and interpret that data. Dr. Bopp's report is conclusory in stating that Plaintiff was "highly motivated," exhibited "good effort," and had "excellent concentration" (Tr. 310), but he did not describe Plaintiff's test responses or include clinical details of Plaintiff's appearance or performance. For example, there is no evidence that he conducted a mental status examination, performed any clinical testing regarding Plaintiff's memory or concentration, asked her about her daily activities, or made any other effort to ensure that his test scores were consistent with her adaptive behavior. Accordingly, the ALJ's questioning of the IQ results because they were unsupported by raw responses was reasonable.

### 3. Ability to Live Independently

Plaintiff next asserts that her ability to live independently and raise her children does not undermine the validity of her IQ test scores. In support of

this proposition, Plaintiff cites district court cases and a case from the Third Circuit to the effect that certain daily activities do not necessarily undermine the validity of an IQ score. *See Bishop v. Barnhart*, 2005 WL 946560, 6 (D.Kan. 2005), quoting *Markle v. Barnhart,* 324 F.3d 182, 187 (3rd Cir. 2003). Again, such cases are not precedential.

Nor are they persuasive. Surely the ALJ was permitted, if not required, to take account of all the evidence in the record, including Plaintiff's daily activities, in determining whether Plaintiff's IQ scores were valid. "[T]he ALJ may discount an IQ score as invalid for a variety of reasons," and this inquiry is not limited "to test results alone in isolation from other factors" such as "educational background and life activities." *McKown*, 1993 WL 335788 at *3 (10th Cir. 1993); *see Lax,* 489 F.3d at 1087.

The regulations specifically recognize that "persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job," and are therefore not disabled, if their adaptive functioning is sufficiently intact.

> We conclude that it was proper for the ALJ to consider other evidence in the record when determining whether Lax's IQ scores were valid and that the record contains substantial evidence to support a finding that Lax's IQ scores were not an accurate reflection of his intellectual capabilities. Our decision is consistent with the reasoning of other circuits on this issue. *See Markle v. Barnhart,* 324 F.3d 182, 186 (3d Cir.2003) (noting that Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record); *Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir.1998) (same); *Muse v. Sullivan,* 925 F.2d 785, 790 (5th Cir.1991) (noting that an ALJ may make factual determinations on the validity of IQ scores); *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir.1986) (Commissioner is not required to make finding of mental retardation based on the results of an IQ test alone).

12

*Lax*, 489 F.3d at 1087. Thus this claim of error is unfounded.

### 4. Educational Background

Plaintiff additionally contends that the ALJ's reliance on her educational level (dropping out of 11th grade due to pregnancy) is not supported by substantial evidence, since regulations provide that formal education completed many years ago may not be indicative of one's ability to work. But the cited regulation states that the ALJ will use the numerical grade level completed in school unless other evidence contradicts it. *See* 20 C.F.R. § 416.964(b). The sole "other evidence" Plaintiff notes is her WRAT testing, which placed her actual educational ability around the 5th grade level.

But here, the issue is not whether Plaintiff can read at a 5th rather than at an 11th grade level, but whether Plaintiff's educational history and progress is indicative of mild mental retardation. Here, the ALJ found that it contradicted a finding of mental retardation, since Plaintiff was not placed in special education classes after 2nd grade, if at all, received promotions to the eleventh grade, and dropped out of school for reasons other than academic failure. Sufficient evidence supports the ALJ's finding that Plaintiff's school history cuts against the validity of the IQ test, which categorizes her as mildly mentally retarded.

### 5. No Medical Confirmation

As to the ALJ's finding that no other medical source reported Plaintiff to have mental retardation, the Plaintiff suggests the possibility that no doctors were asked their opinion of the matter. But this is mere speculation.

Plaintiff contends she "has a long and well documented history of Mild Mental Retardation, MDD, Mood Disorder, Affective Disorder/Anxiety Disorder, with these diagnoses beginning when she was in her teens." Dk. 17, p. 2. The inclusion of "mental retardation" in this list is most inaccurate. Plaintiff fails to show *any* documented history or diagnosis of "mild mental retardation" in the record, and no indicators of it at any time when Plaintiff was in her teens or at any time prior to her IQ test at age 32. Plaintiff presented no medical expert testimony. Plaintiff had some history of affective disorder/anxiety disorder, yet those impairments are not synonymous with mental retardation.

Instead, as the ALJ noted, Plaintiff had undergone a psychiatric examination at KU on July 10, 2011, in which she demonstrated essentially normal clinical performance. Similarly, on July 21, 2010, Dr. Jordan had performed a consultative examination and raised no concern about Plaintiff's cognitive functioning or intelligence. No other medical source reported Plaintiff to have mental retardation in 32 years. The ALJ reasonably found, in accordance with the evidence, that that this absence is significant and cuts against the validity of the IQ test.

14

### 6. ALJ's Own Observations

The ALJ also relied in part upon her own observations at the hearing that Plaintiff was articulate, and read and wrote responses to disability forms without assistance. Plaintiff contends that an ALJ cannot reject IQ scores based solely on personal observations of the claimant and speculative inferences drawn from the record. *Morales v. Apfel,* 225 F.3d 310, 318 (3d Cir. 2000).

But here, the ALJ's decision shows that the Plaintiff's demonstrated abilities at the hearing were only one factor in the validity finding, as is proper. *Cf, Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000) (observing that while an ALJ "may not rely solely on his personal observations to discredit a plaintiff's allegations, he may consider his personal observations in his overall evaluation of the claimant's credibility").

### IV. Conclusion

Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's IQ scores were not an accurate reflection of her intellectual capabilities. Accordingly, the Court need not review whether the third criteria for mild mental retardation – the significant limitations standard of § 12.05 - was met. Taken together, the reasons given by the ALJ are sufficient to support her finding that Plaintiff failed to show that her impairments meet the required criteria for the mental retardation listing.

IT IS THEREFORE ORDERED that the judgment of the Commissioner is affirmed pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Dated this 16th day of July, 2014, at Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge